FILED
2013 Dec-12  AM 11:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| JOHN W. BARTLETT and<br>BARBARA C. BARTLETT, | } | |
| | } | |
| Plaintiffs, | } | |
| | } | |
| vs. | } | Case No.: 1:10-cv-1620-MHH |
| | } | |
| DENNIS G. PRESTON; JOAN K.<br>PRESTON; DENNIS S. PRESTON;<br>DAAK, INC.; D&S PROPANE,<br>INC.; MALISA DUNSON;<br>BRENDA PRESTON; JACK<br>NORTON; and BENNIE<br>KILGORE, | } | |
| | } | |
| Defendants. | } | |

## MEMORANDUM OPINION

Plaintiffs John and Barbara Bartlett have objected to the Magistrate Judge's

Report and Recommendation denying their motion for partial summary judgment on

their state law claims for breach of contract, unjust enrichment, and money had and

received.[1]  (Docs. 91, 92 107, 110).  After considering the objections, the summary

judgment motion, the supporting and opposing memoranda, the parties' evidentiary

submissions, and the relevant law, for the reasons discussed below, the Court finds

---

[1] The plaintiffs also filed additional tort claims, including misrepresentation (Count I); suppression (Count II); promissory fraud (Count III); negligence (Count IV); wantonness (Count V); conversion (Count VI); conspiracy (Count VII); and, fraudulent conveyance (Count XI). (*See* Doc. 79).  These claims are not before the Court and remain pending.

that the Prestons and DAAK are liable to the Bartletts as a matter of law under the Bartletts' claim for money had and received.  The Court enters judgment for the defendants on the Bartletts' breach of contract claim.

## SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The court should state on the record the reasons for granting or denying the motion."  *Id.*  "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case."  Fed. R. Civ. P. 56(g).

Here, the Bartletts have moved for summary judgment on three state law claims on which they, as plaintiffs, will bear the burden of proof at trial.  Accordingly, to obtain summary judgment, the Bartletts initially must "show *affirmatively* the absence of a genuine issue of material fact."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (quoting *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)) (emphasis in *Fitzpatrick*).  The Bartletts must support their motion

with "credible evidence" which "would entitle [them] to a directed verdict if not controverted at trial." *Id.*

> In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party. If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the non-moving party, in response, come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.

*Id.*

If the Bartletts sustain their initial burden, then, to avoid summary judgment in the Bartletts' favor, the defendants "must come forward with evidence sufficient to call into question the inference created by the [Bartletts'] evidence on the particular material fact." *Fitzpatrick*, 2 F.3d at 1116.

> Only if after introduction of the non-movant's evidence, the combined body of evidence presented by the [] parties relevant to the material fact is still such that the movant would be entitled to a directed verdict at trial - that is, such that no reasonable jury could find for the non-movant - should the movant be permitted to prevail without a full trial on the issues.

*Id.*

Pursuant to Rule 56(f)(1), "the court may grant summary judgment for a nonmovant." Fed. R. Civ. P. 56(f)(1).

As a general proposition, of course, notice and an opportunity to be heard should be given before entry of summary judgment for a

nonmovant. *See Rule 56(f)* Fed. R. Civ. P. But the Eleventh Circuit has "distinguished between *sua sponte* grants of summary judgment in cases involving purely legal questions based on complete evidentiary records, and cases involving factual disputes where the non-moving party has not been afforded an adequate opportunity to develop the record." *Artistic Entertainment, Inc. v. City of Warner Robins*, 331 F.3d 1196, 1201 (11th Cir. 2003); *see also Jones v. Fulton County, Ga.*, 2011 WL 5244788 (11th Cir. Nov. 2, 2011) ("formal notice may not be necessary where a legal issue has been fully developed and the evidentiary record is complete").

*Branch Banking and Trust Co. v. Howard*, 2013 WL 951652, *6, n. 11 (S.D.Ala. March 8, 2013) (*sua sponte* granting summary judgment in favor of defendants where the Court entered summary judgment for the plaintiff on its breach of contract claim, so that, as a matter of Alabama law, the plaintiff could not recover on its alternative equitable claims).[2]

Many of the material facts in this action are undisputed. Where the parties dispute a material fact, the Court views that fact in the light most favorable to the Prestons and DAAK, the non-moving parties. *Hill v. Wal-Mart Stores, Inc.*, 510 Fed. Appx. 810, 813 (11th Cir. 2013) (citing *Mann v. Taser Int'l, Inc.,* 588 F.3d 1291, 1303 (11th Cir. 2009)).

---

[2] Rule 56(f)(1) states, in its entirety, "[a]fter giving notice and a reasonable time to respond, the court may:   grant summary judgment for a nonmovant." Fed. R. Civ. P. 56(f)(1).

## REVIEWING REPORTS AND RECOMMENDATIONS

Rule 72 of the Federal Rules of Civil Procedure requires the Court to "determine de novo any part of the magistrate judge's disposition" to which a party has objected.  Fed. R. Civ. P. 72(b)(3); *see also* 28 U.S.C. § 636(b)(1); *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983) (citing *Nettles v. Wainwright*, 677 F.2d 404, 410 (5th Cir. Unit B 1982)).  A de novo review is "an independent determination of the issues."  *U.S. v. First City Nat'l Bank of Houston*, 386 U.S. 361, 368 (1967).

The Court takes a somewhat different approach to its review of the portions of the report to which no party has objected.  The Court reviews all unchallenged legal conclusions de novo and all unchallenged factual findings for plain error or manifest injustice.  *Dupree v. Warden*, 715 F.3d 1295, 1299-1304 (11th Cir. 2013).[3] Ultimately, the Court "may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

## STATEMENT OF FACTS FROM THE REPORT

The "Factual and Procedural Background" section of the magistrate judge's Report and Recommendation states as follows:

---

[3] Plain error is "error that has seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Sykes v. McDowell*, 786 F.2d 1098, 1104 (11th Cir. 1986) (internal quotation marks and citations omitted).

Defendant Dennis G. Preston ("Dennis") formed D&S Propane, Inc. ("D&S, Inc.") in February 2005. Dennis Depo. (Doc. 93-1) 15. D&S, Inc. sold propane gas and related supplies and equipment. *Id.* at 20-22, 28-31. D&S, Inc. initially was capitalized through a bank loan of $120,000, a $52,000 loan from Bennie Kilgore, and a $25,000 loan from Jack Norton. *Id.* at 25-28, 42-45. Repayment of these loans is memorialized in monthly checks from D&S, Inc. of fixed-rate interest payments to Bennie Kilgore and Jack Norton. *Id.* at 24-28, 43-45.

Dennis had previously worked as an insurance agent with Liberty National Insurance Company, and had opened a 401(k) retirement account with the company. In June 2006, he rolled the money in this account—over $200,000—into another 401(k) account with Multi-Service Financial that then used the money to purchase stock in a corporation named DAAK, Inc. ("DAAK"). *Id.* at 8-14, 17-18. DAAK is the sponsor of this 401(k) account, and Dennis is the account's only investor or beneficiary. *Id*. at 8-9, 14. Dennis and his DAAK 401(k) retirement account are the only shareholders in DAAK. *Id*. at 8, 14. 1,280 shares were issued to Dennis individually and 20,012 shares were issued to his retirement plan. *Id*. at 8-10.[4] Dennis is the President of DAAK. *Id.* at 105. His wife, Joan K. Preston ("Joan")

---

[4]*See also* Doc. 110-1 at 2-4 (share certificates).

(collectively with Dennis, "the Prestons"), is its bookkeeper and Vice President. *Id*.
at 45–46. His son, Dennis S. Preston ("Scotty"), is also a Vice President. *Id*. at 175.

Dennis formed DAAK to assume and carry-on the business of D&S, Inc. *Id*.
at 15. A large portion of the initial cash infusion into DAAK was used to satisfy a
bank loan that provided startup capital for D&S, Inc. *Id*. at 17-18. Since its
formation, DAAK has done business under the trade name "D&S Propane." *Id*. at 15.
Dennis and Joan instructed their accountant to close out D&S, Inc., but took no steps
to legally implement or document the purported transfer. *Id*. at 16; *see also* Doc. 93-2
¶ 2; Joan Depo. II (Doc. 93-3) 12. Dennis contends that he operated under the belief
that D&S, Inc. had been legally terminated and that DAAK assumed D&S, Inc.'s
assets, debts, and obligations. Dennis Depo.[5] 19–25. However, Dennis did not take
steps to wind down or dissolve the corporation; D&S, Inc. is still active. *See* Dennis
Depo. 16; Joan Depo. II 106-07.

John W. Bartlett ("John") is married to Barbara C. Bartlett ("Barbara")
(collectively "the Bartletts"). John has known Dennis for fifty years; the two men

---

[5]After his initial reference to Mr. Preston's deposition, including the document number,
the magistrate judge's Report did not include future citations to the document number
when citing Mr. Preston's deposition. For clarity, the Court notes that Mr. Preston's
deposition is Doc. 93-1. The Court has cited it as such in the discussion section of this
memorandum opinion.

used to ride the school bus together as children.  Dennis Depo. 110.  In March 2009, Dennis offered to sell the Bartletts a fifty-percent (50%) interest in DAAK.  *Id*. at 110-11.  Dennis represented that the gross sales from the previous year exceeded $750,000. *Id*. at 118-19.  Dennis also told John that the business made a gross profit of $351,000 from sales on gas. *Id*. at 158–64; *see also* John Depo. (Doc. 101-1) 31-32.  The two agreed on a purchase price of $400,000.  Dennis Depo. 137, 151.  Dennis represented that the purchase money would be used to expand the operations of the business into Georgia and to pay off corporate debt.  *Id*. at 117-18, 129, 233-34, 151. The two set a goal for each to take out $2,000.000 a month from the corporation premised upon a profit of eighty cents per gallon of future sales.  *Id*. at 146.  Profits, to the extent there were any, would be divided evenly.  Dennis Depo. 146.

John informed Dennis that he could pay $100,000 up front, that he would have to borrow $200,000, and that the remaining $100,000 would not be available until the fall of that year. *Id.* at 137. John explained to Dennis that he would have to mortgage his farm to borrow the $200,000 and would have to cash in his certificates of deposit to pay the last $100,000 installment. *Id.* at 138, 142.

Dennis directed Barbara to write the first $100,000 check out to him personally, rather than in the name of the business. *Id.* at 128. On March 31, 2009, the Bartletts issued a check in the amount of $100,000 to the order of Dennis Preston as a down payment on their purchase of fifty percent of the business. *Id.* at 64; Joan Depo. II 38;[6] Doc. 93-6 at 2; Barbara Depo. (Doc. 93-5) 40. Dennis and Joan deposited the $100,000 into their personal joint checking account with Metro Bank. Dennis Depo. 64-65, 128; Doc. 93-4 ¶ A-1. In the month preceding this deposit, Dennis and Joan had a balance forward of $37.65 in their joint checking account. Dennis Depo. 70; Doc. 93-7 at 2. Furthermore, unbeknownst to the Bartletts, Dennis, Joan and DAAK were all insolvent as of the time of the Bartletts' initial investment. *See* Doc. 93-2 ¶¶ 4–5.[7]

---

[6]After his initial references to Ms. Preston's deposition, including the document number, the magistrate judge's Report did not include future citations to the document number when citing Ms. Preston's deposition. For clarity, the Court notes that Ms. Preston's deposition is separated into two volumes. The first volume is Doc. 93-11. The second volume is Doc. 93-3. The Court has cited it as such in the discussion section of this memorandum opinion.

[7] The Report cites Doc. 93-2 ¶¶ 4–5 for the proposition that the Prestons and DAAK were insolvent when the Bartletts made their first installment payment; however, document 93-2 does not explain whether those defendants' insolvency was "unbeknownst to the Bartletts." Defendants did not object to this factual finding, and nothing in the record causes the Court to question the assertion. *See, e.g.*, Dennis Depo. 58-59, 112-14, 161-62, 165; John Depo. (Doc. 101-1) 47, 55-56.

9

Within a period of three months, defendants spent $59,863.68 of the first investment on what they admit to be "personal expenditures." *See* Doc. 93-4 at 8-10; Joan Depo. II 38, 60-61 (transferring $10,000 from the "business expenses" portion of defendants' accounting to personal expenses). Those personal expenditures include payments to satisfy personal credit card debts and the personal debts of their family members, including their son, Scotty, their daughter-in-law, Brenda Preston ("Brenda"), and their daughter, Malisa Dunson ("Malisa"). *See* doc. 93-4 at 8-10; Joan Depo. II 38–60. The remaining $40,136.32 was all spent, whether for business or personal purposes, by June 11, 2009. *See* Doc. 93-4 at 7-8. For example, of this second allotment, the accounting provided by defendants shows the following expenditures:

> A. $1,000 was paid directly to Scotty Preston for "Compensation for Additional [Business] Duties . . . ."
>
> B. $800 was spent to service Dennis's pickup truck. Joan Depo. II 61–62.
>
> C. $2,014.92 was paid to satisfy Dennis's personal credit card debt with Citi Card, although defendants contend the expense paid off was one incurred by the business. Joan Depo. II 68.

10

D. $3,000 was paid to a credit card account held by the business, but the debt on that account was for both personal and business purposes. *Id.* at 63–65.

E. $20,374.50 was paid to NGL Supply Co. LTD.

F. $2,680 was used to pay for Travelers liability insurance for the business.

G. $575 was paid for the preparation of DAAK's year-end corporate taxes.

Doc. 93 Ex. D.

After receiving the Bartletts' first installment, Dennis presented the Bartletts with a one and a half page contract for the sale of fifty percent of the business to the Bartletts for a total purchase price of $400,000. Dennis Depo. 123-24; Doc. 93-9. John took the document, stating that he and his "old lady" would look at it. Dennis Depo. 136. The proposed Sales Contract was never signed. *Id.*; *see also id.* at 231.

Dennis requested that the second installment be made out to the order of the business. Dennis Depo. 139; Barbara Depo. 113.[8] On June 22, 2009, the Bartletts

---

[8]  After his initial references to Ms. Bartlett's deposition, including the document number, the magistrate judge's Report did not include future citations to the document number

issued a check payable to the order of D&S Propane in the amount of $200,000. Dennis Depo. 138; Doc. 93-4 at 11; Doc. 93-6 at 8. Dennis deposited the money into DAAK's business checking account with Metro Bank. Doc. 93-4 at 2 ¶ A-2. Defendants have accounted for all but $1,029.36 of plaintiffs' second installment of $200,000, (*id*. at 11-23):

   A. $125,000 was paid to Metro Bank to be applied to DAAK's existing line of credit and to satisfy a promissory note:

      1. $39,461.96 of that $125,000 debt was accrued to satisfy debts of D&S, Inc. to Econo-Gas Supply, LLC. *See* Joan Depo. II 117–18.
      2. $10,000 of that $125,000 debt to Metro Bank was accrued to satisfy Dennis's debt on his personal credit card account with Citibank. *See* Joan Depo. II 67-68.

   B. $18,597.89 was paid to Vision Finance to purchase propane tanks that the business had been leasing.

   C. $55,372.75 was paid for expenses incurred towards defendants' failed efforts to expand the business into Georgia.

---

when citing Ms. Bartlett's deposition. For clarity, the Court notes that Ms. Bartlett's deposition is Doc. 93-5. The Court has cited it as such in the discussion section of this memorandum opinion.

On August 4, 2009, plaintiffs issued a check to the order of Dennis Preston for $20,000 and a second check in the amount of $55,000 as the third installment of the purchase price. Dennis Depo. 59-60; Barbara Depo. 67; Doc. 93-6 at 4-5.  On August 20, 2009, plaintiffs issued a final check to the order of Dennis Preston for $25,000 in full satisfaction of the purchase price. Dennis Depo. 57; Barbara Depo. 67; Doc. 93 at 6. The Prestons deposited these three final payments, which totaled $100,000, into their personal checking account with Metro Bank. Dennis Depo. 57–60; Doc. 93-4 at 24.

A. [Per Bennie Kilgore's (Joan's mother) request and in satisfaction of the debt D&S, Inc. owed to Ms. Kilgore, d]efendants[9] transferred $52,000 of the final installment to Modern Woodmen of the World to fund an annuity contract in the name of Joan Preston. Dennis Depo. 32; Joan Depo. II 84; Joan Depo. I (Doc. 93-11) 130–32; Doc. 93-12 at 4. Joan receives a monthly interest payment on the annuity contract.  Joan Depo. II 84.[10] This annuity contract was

---

[9]Although the parties did not object to the Report's factual findings in this paragraph, the bracketed portion is added for clarity. *See* Dennis Depo. 32; Joan Depo. 84-86.

[10]The Court notes and accepts as true for summary judgment purposes Joan's statement that she gives the entire check to her mother each month. Joan Depo. II 84. Joan asserts that the annuity is her mother's money, and although the annuity is solely in Joan's name, and her mother's will does not address the annuity, Joan believes that the proceeds of the annuity will be divided among her mother's five alleged heirs upon her mother's death. *Id.* at 87-91.

purchased shortly after the Prestons learned they would not receive the necessary permits to operate the business in Georgia. Dennis Depo. 147-48.[11]

B. Defendants withdrew $25,000 in three separate cash withdrawals of $8,000, $8,000, and $9,000, and paid the cash money to Jack Norton ("Jack"), Brenda Preston's father, whom defendants allege loaned initial start-up principal to the company. Dennis Depo. 42-45, 61–63, 92. Plaintiffs were not informed that their purchase money would be transferred to Jack Norton [specifically], and the money was withdrawn and paid in cash in order to conceal the payment.[12] Dennis Depo. 59, 92–93.

C. Defendants paid $1,100.00 directly to Scotty Preston for alleged business expenses.

Doc. 93-4 at 24-25.  The other $13,943.92 of the final payment is unaccounted for. *Id.*

---

[11]Although the Report does not explain whether this temporal proximity is significant, Dennis contends, and the Court must accept as true for summary judgment purposes, that these two events have no relationship. Dennis Depo. 148.

[12]It is noted that although Dennis admitted that the withdrawal scheme was to "conceal" the payments, Dennis clarified, upon objection from his counsel, that they "didn't want it to raise any red flags as far as us taking out twenty-five thousand dollars to go buy drugs or something like that . . . or to notify the IRS." Dennis Depo. 93.

On September 16, 2009, the Prestons borrowed $25,000 from Metro Bank and deposited the funds into DAAK's business checking account for its use. Dennis Depo. 208-210; Doc. 93-4 at 15.  At that time, the Prestons were holding $100,000 of the Bartlett's purchase money in their personal checking account. *See* Doc. 93-13 at 2. Since receiving the Bartlett's $400,000, defendants have incurred $77,989.55 in additional debt in the name of the business by drawing on its line of credit with Metro Bank.  Doc. 93-4 at 15-16. This does not account for any additional debt incurred with suppliers or credit card companies, if any.

In connection with each check paid by the Bartletts, Dennis signed a written receipt acknowledging his acceptance of the funds as payment on the Bartlett's balance on their purchase of fifty percent of the business. *See* Barbara Depo. 115; Doc. 93-6 at 7-8, 10.  DAAK, the second shareholder in DAAK, never took any action to authorize Dennis's agreement to sell the Bartletts fifty percent of the business. Dennis Depo. 106, 243.  DAAK never issued any stock to the Bartletts or provided them with money or benefits. *Id*. at 123, 146, 171-72.[13]  The Bartletts were

---

[13]Defendants have implicitly objected to this finding, since they contend that DAAK allowed the Bartlett's to buy "some" gas at cost and delivered other gas that has not been paid for. Doc. 112 at 2; doc. 102 at 7, 13; Dennis Depo. 146. Plaintiffs contend the opposite: that they have not received all the gas for which they paid. Doc. 103-1 at 2-5; doc. 110 at 3-4.

never given any express rights or control over the business, although they have received liquid propane gas since their investment in DAAK. *Id.* at 123, 145.

John indicated that he never intended to be involved in the corporation on a day-to-day basis, and he rarely visited DAAK's business location. John Depo.[14] 34-36, 47-48, 58-59.  Furthermore, he did not demand any profit sum from Dennis until a year had passed after the initial transaction.  *See* Barbara Depo. 95-96; John Depo. 54-55.  However, John was involved in certain corporation affairs. In April 2010, the business's year-end, he brought a bookkeeper to the office to examine the business records and was denied access to the records. Dennis Depo. 154-56, 173; John Depo. 47-48. He allowed a piece of his farm located in Georgia to be used for the establishment of a tank farm for the storage of bulk propane. John Depo. 40-42. A bulk propane storage facility was constructed on the Bartletts' farm and remains there. *Id*. at 40-43.

John and Dennis participated in advocating for a business license permit for the subject site before officials in Carroll County, Georgia. The Carroll County Planning

---

[14]After his initial references to Mr. Bartlett's deposition, including the document number, the magistrate judge's Report did not include future citations to the document number when citing Mr. Bartlett's deposition.  For clarity, the Court notes that Mr. Bartlett's deposition is Doc. 101-1.  The Court has cited it as such in the discussion section of this memorandum opinion.

Commission denied the permit; it was appealed to the Carroll County Commissioners and was denied. John Depo. 42-46.

In April 2010, the Bartletts entered into a partnership agreement with James and Debra Camp of Carroll County, Georgia, which recognized the Bartletts' investment in DAAK and, by the terms of the executed Partnership Agreement, transferred "one half of the ownership of the Bartlett[s'] position in D&S Propane and Daak, Inc. to the Camp[s]." Doc. 101-2.

On June 23, 2010, plaintiffs filed this action against defendants the Prestons, their son Scotty, D&S Propane, Inc., DAAK. The complaint was later amended to include the family members listed above who received payments from the Prestons during this time period. *See* Third Amend. Compl. Doc. 79. Plaintiffs filed this motion for partial summary judgment against the Prestons and DAAK on their claims for unjust enrichment, money paid by mistake, and breach of contact. Doc. 91.[15]

## PROCEDURAL BACKGROUND

After the magistrate judge issued his Report and Recommendation, the Bartletts objected to it. Factually, they contend that the Report misstates the record when it

---

[15] (Doc. 107, pp. 1-9).  The Bartletts' motion for partial summary judgment does not seek relief against defendants Malisa Dunson, Brenda Preston, Jack Norton, or Bennie Kilgore.

mentions that the Prestons' propane business "failed." (Doc. 110, pp. 2-3) (citing Doc. 107, pp. 11-13). The Bartletts assert that the attempt to expand the propane business into Georgia failed, but "DAAK is a going concern that continues to operate its propane business, doing business as D&S Propane." (Doc. 110, p. 3). Additionally, the Bartletts dispute the portion of the Report that states that they received propane gas from DAAK for which they have not paid. (Doc. 110, pp. 3-4). The balance of the Bartletts' objections pertain to the legal analysis in the Report and Recommendation. (Doc. 110, pp. 5-16). The Bartletts filed DAAK stock certificates and DAAK's corporate by-laws in support of their objections. (Docs. 110-1. 110-2).

The Prestons and DAAK responded to the Bartletts' objections. (Doc. 112). These defendants state that Billy Bartlett[16] "had no idea or concept of stock ownership at the time of his investment in the business. He knew nothing of the legal form under which the business operated and there was absolutely no discussion of stock shares." (Doc. 112, p. 2) (citing Doc. 101-1, p. 50). The Prestons argue that the magistrate judge properly denied the Bartletts' summary judgment motion because disputed facts pertaining to a number of issues preclude judgment as a matter of law. (Doc. 112, pp. 2-3).

---

[16] For clarification, the Court notes that Billy Bartlett is plaintiff John Bartlett. Mr. Bartlett referred to himself as Billy in his deposition. (*See* Doc. 101-1, p. 5). The defendants have also referred to Mr. Bartlett as Billy in their depositions. (*See* Doc. 93-1, p. 7; Doc. 93-11, p. 36).

In the process of evaluating the Bartletts' objections and the defendants' response, the Court has reviewed the following depositions: (1) Dennis Preston (Doc. 93-1); (2) Joan Preston (Docs. 93-3, 93-11); (3) John Bartlett (Doc. 101-1); and (4) Barbara Bartlett (Doc. 93-5). The Court also has reviewed the draft security agreement that Dennis offered to Billy, the five checks that the Bartletts gave to Dennis, the receipts that Dennis provided to Joan for the checks, and the defendants' responded to the Bartletts' requests for admission. (Docs. 93-2, 93-6, 93-9).

The Court notes that there is no jury demand in this case.[17]

## DISCUSSION

The Bartletts contend that they are entitled to summary judgment on their claims for unjust enrichment (Amended Complaint, Count VIII), money paid by mistake (i.e., money had and received) (Amended Complaint, Count X), and breach of contract (Amended Complaint, Count IX). (Docs. 92, 110).[18] To evaluate the

---

[17] Though it has no bearing on the issues before the Court, by way of background, when Chief Magistrate Judge Greene retired, the undersigned was appointed to replace him. The undersigned became a magistrate judge in October 2012. At that time, the Bartletts objections to Chief Magistrate Judge Greene's Report were pending before another district court judge. In October 2013, the undersigned was confirmed as a district court judge, and this matter was transferred to the undersigned's docket in her capacity as a district court judge.

[18] The Bartletts' third amended complaint is Doc. 79.

19

Bartletts' claims, the Court first must consider the Bartletts' motion for summary judgment on their breach of contract claim because "Alabama law is clear that quasi-contractual, equitable remedies such as unjust enrichment are not cognizable in the presence of an express contract between the parties that governs the same subject matter." *Branch Banking and Trust Co. v. Howard*, 2013 WL 951652, *5 (S.D.Ala. March 8, 2013) (citing *Lemoine Co. of Ala., LLC v. HLH Constructors, Inc.*, 62 So. 3d 1020, 1028 (Ala. 2010); *Kennedy v. Polar-BEK & Baker Wildwood Partnership*, 682 So. 2d 443, 447 (Ala. 1996)).[19]  The Court may reach the Bartletts' equitable theories only if the Court finds that the Bartletts did not enter an express contract concerning the sale of propane gas.

### 1.    Breach of Contract

"'The elements of a breach-of-contract claim under Alabama law are (1) a valid contract binding the parties; (2) the plaintiffs' performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.'"  *Shaffer v. Regions Financial Corp.*, 29 So. 3d 872, 880 (Ala. 2009) (quoting *Reynolds Metals Co. v. Hill*,

---

[19]  *See also Id.* at *6 ("[A]s a matter of Alabama law, a plaintiff cannot recover both under a quasi-contract theory (*i.e.,* unjust enrichment, quantum meruit, money had and received) as a matter of equity and under an express contract theory covering the same subject matter.").

825 So. 2d 100, 105 (Ala. 2002)).  The magistrate judge's Report operates from the assumption that the parties entered into a valid oral agreement for the sale of fifty percent "of the business." (Doc. 107, p. 12).  The undersigned respectfully disagrees.

"[W]hen the facts material to the question whether a contract was formed are undisputed, the existence of a contract is a question of law for the court. *See, e.g., Denson v. Kirkpatrick Drilling Co.,* 225 Ala. 473, 479, 144 So. 86, 91 (1932) (noting that whether an offer has been accepted is a question of law for the court when the facts are undisputed and a question of fact for the fact-finder when the facts are disputed or subject to inferences that could be drawn)." *Walker v. Walker*, 2013 WL 5861499, *4 (Ala. Civ. App. Nov. 1, 2013).  "Further, whether a contract fails for indefiniteness is a question of law." *Id.*  (citing *White Sands Grp., L.L.C. v. PRS II, LLC,* 998 So. 2d 1042, 1052 (Ala. 2008)).  Here, the facts material to the question of contract formation are undisputed, so the Court must determine whether an express contract was formed.

Under Alabama law, for a contract to be valid, there must be "'mutual assent to terms essential to the formation of a contract.'" *Shaffer*, 29 So. 3d at 880 (quoting *Ex parte Grant*, 711 So. 2d 464, 465 (Ala. 1997)); *see also Stacey v. Peed*, 2013 WL 5506524, *2 (Ala. Oct. 4, 2013).  "'The rule is that the minds of the parties must meet

21

as to all the essential features of a contract.'"  *Walker*, 2013 WL 5861499 at *4

(quoting *Air Conditioning Eng'rs, Inc. v. Small,* 259 Ala. 171, 175, 65 So. 2d 698,

703 (1953) (citing *Cochran Lumber Co. v. Paterson & Edey Lumber Co.,* 202 Ala.

366, 80 So. 448 (1918)).  Agreements "'are not valid when there has been no meeting

of the minds with regard to the final terms of the agreement or when the parties have

merely agreed to later agree.'"  *Id.* (quoting *Grayson v. Hanson,* 843 So. 2d 146, 150

(Ala. 2002)).

On the record before the Court, the Bartletts are not entitled to summary

judgment on their breach of contract claim because they cannot show affirmatively

that the parties mutually assented to the material terms essential to the formation of

a contract for the sale of a fifty percent interest in the Prestons' propane business.  In

fact, the undisputed facts in this case demonstrate that there was no meeting of the

minds concerning all the essential features of a contract, so that no contract was

formed as a matter of law.

This much is certain:  Dennis operated a business in which he sold propane

gas, and the Bartletts paid $400,000 to buy a fifty percent interest in that business.

But, as so often is the case, the devil is in the details.  Examination of the undisputed

details in this case reveals that there was no meeting of the minds concerning the subject of Dennis's agreement with Billy.

When Dennis visited Billy's farm in March 2009 to deliver propane gas, Dennis asked Billy if he would "be interested in getting in the gas business." (Doc. 93-1, p. 111:1-8). There is no evidence that Dennis discussed with Billy the fact that the propane business operated through a corporation, DAAK, Inc. Billy's uncontroverted testimony is that he, "didn't know nothing about D-A-K and all that. All I thought was D&S Propane. I didn't know nothing about DAAK, Incorporated, none of that stuff." (Doc. 101-1, p. 75:6-9).[20]

The Prestons and DAAK concede the point. In their response to the Bartletts' objections to the Report and Recommendation, the defendants stated that Billy Bartlett "had no idea or concept of stock ownership at the time of his investment in

---

[20]  In early 2005, Dennis formed D&S Propane, Inc. That corporation sold propane gas and related supplies. (Doc. 93-1, p. 24). Slightly more than one year later, Dennis incorporated DAAK, Inc. to carry on the business of D&S Propane, Inc. DAAK operated under the trade name "D&S Propane," but the Prestons did not dissolve D&S Propane, Inc. (Doc. 93-1, pp. 15-16; Doc. 93-3, pp. 106-07). The Court consulted the records of the Alabama Secretary of State and found that D&S Propane, Inc. and DAAK, Inc. are still viable Alabama corporations. The Court may take judicial notice of these records. *See Horne v. Potter*, 392 Fed. Appx. 800, 802 (11th Cir. 2010) ("The district court properly took judicial notice of the documents . . . , which were public records that were 'not subject to reasonable dispute' because they were 'capable of accurate and ready determination by resort to sources whose accuracy could not reasonably be questioned.'") (quoting Fed. R. Evid. 201(b)).

the business.  He knew nothing of the legal form under which the business operated and there was absolutely no discussion of stock shares." (Doc. 112, p. 2) (citing Doc. 101-1, p. 50).  Dennis testified that "the corporation" would have to issue stock to the Bartletts to consummate the sale of fifty percent of the company (Doc. 93-1, p. 105), and he acknowledged that DAAK, Inc. did not authorize the sale of half of the business.  (Doc. 93-1, pp. 126-127).

Documents relating to the Bartletts' $400,000 payment substantiate the Court's finding that there was no meeting of the minds concerning the subject of the parties' purported agreement.  To buy an interest in the propane business, the Bartletts issued five checks totaling $400,000 between March 2009 and August 2009. Dennis Preston is the payee on four of the checks; one names "D&S Propane" as the payee.  (Doc. 93-6).[21]  Three of the checks refer to the "partnership" in the memo section of the check.  (Doc. 93-6, pp. 4-6).  Dennis Preston provided hand-written receipts for the payments.  (Doc. 993-6).  Two of the receipts state that the payment is for "½ of D&S Propane."  Another states that the payment is for "½ of propane business."  (*Id.*). Dennis testified that he thought that the $400,000 that the Bartletts paid for an interest

---

[21] Doc. 101-1, p. 75; Doc. 102, p. 20.

in the propane business was "partly mine and partly the corporation's."  (Doc. 93-1, p. 104:5-7).

According to Dennis, DAAK, Inc. did not issue stock certificates to Billy "because we never could get together and go get an agreement signed."  *Id.* at 231.[22] The record establishes that the parties' inability to agree on the consideration that the Bartletts were to receive in exchange for their $400,000 investment caused Billy to refuse to sign the written agreement that Dennis provided to him.  Billy understood

---

[22]  As a matter of Alabama law, DAAK's failure to issue stock certificates to Billy Bartlett is not inconsequential.  Shares of a corporation are securities.  *Andrews v. Troy Bank and Trust Co.*, 529 So. 2d 987, 990 (Ala. 1988); Ala. Code § 7-8-103(a).  "[T]he formal steps necessary for a purchaser to acquire a direct interest in a security" are known as "the requirements for 'delivery.'" Ala. Code § 7-8-301, cmt. 1.  "There must be a voluntary parting with control in order to effect a valid transfer of a certificated security as between the parties." Ala. Code § 7-8-304, cmt. 3.  Alabama law mandates "physical possession" of the stock certificate unless the alleged transfer fits into one of two exceptions.  *Butler v. MaxiStorage, Inc.*, 33 So. 3d 1221, 1227 (Ala. Civ. App. 2009).  The exceptions are:

> (1) when the transferor attempts to transfer only partial ownership so that he or she becomes a co-owner with his or her transferee, and (2) when an identified security to be delivered is still in the possession of a third person when that third person acknowledges that he or she holds the security for the purchaser.

*Butler*, 33 So. 3d at 1227-28. The language in the second exception comes from Ala. Code § 7-8-313(1)(e), which has been repealed. The "exception" is now embodied in slightly different language in § 7-8-301(a)(2) as a method of delivery:  "another person, other than a securities intermediary, either acquires possession of the security certificate on behalf of the purchaser or, having previously acquired possession of the certificate, acknowledges that it holds for the purchaser[.]"  The first exception is not met because Dennis and Billy's agreement did not contemplate Billy and Dennis becoming a co-owners of the same DAAK, Inc. shares. The second does not apply because it is undisputed that DAAK never issued securities, so it could not possibly have conveyed securities to a third person on Billy Bartlett's behalf.

25

that he was "to get two thousand dollars a month draw and 50 percent of the profits."

(Doc. 101-1, p. 118:8-9).  According to Dennis, "[w]hat we said that we was going

to try to get the company based on four hundred thousand gallons of sells [sic] per

year that we had done practically the year before.  That we was going to try to make

eighty cents per gallon, and that me and him both ought to be able to take a two

thousand dollar a month draw." (Doc. 93-1, p. 146:2-11).  When Dennis offered Billy

a two-page written agreement that would have bound DAAK, Inc. "to transfer a 50%

ownership interest in said Corporation to BILLY BARTLETT . . . ," Billy refused to

sign it in part because the proposed written agreement did not mention a $2,000

monthly draw.  (Doc. 93-1, pp. 124, 135-36, 146; Doc. 93-9, p. 2; Doc. 101-1, pp. 62-

63).  During his deposition, Dennis testified that Billy "didn't actually get anything"

in March 2009, "but we was working on an agreement."  (Doc. 93-1, p. 123).

On this record, there is no meeting of the minds regarding terms essential to

the sale of a fifty-percent interest in the Prestons' propane business.  Summing up the

arrangement in their summary judgment brief, the Prestons and DAAK say that

"Bartlett left the negotiations with the vague concept that he was 50% owner of the

business known as D&S, Inc." (Doc. 102, p. 20).  Though these defendants now

insist that they "have at all times regarded Bartlett as a 50% owner of DAAK, Inc.,"

Dennis admitted in his deposition that, "[w]e didn't have an agreement on anything, if you get right down to it." (*Id.* at 19; Doc. 93-1, p. 156).

Under Alabama law, there is no contract where the parties do not agree on the subject of the contract or its material terms. *Ingram v. Pollock*, 557 So. 2d 1199, 1200 (Ala. 1989) (holding that trial court erred in enforcing a settlement agreement where there was no meeting of the minds because one of the parties' lawyers drafted the agreement in terms of Canadian dollars instead of American dollars and stating that "this discrepancy between the parties' ultimate terms of the settlement agreement was of no little consequence, and as a result, there was no meeting of the minds, nor was there a validly executed settlement agreement.");[23] *see generally Hogan v. Allstate Beverage Co., Inc.*, 2012 WL 6027748 (M.D.Ala. Dec. 4, 2012) ("With no

---

[23] *See also Walker*, 2013 WL 5861499 at *5 ("The record indisputably shows that both parties intended for their daughter to receive title to the Sand Mountain properties, and, thus, a provision reflecting that intent was material to any agreement. Counsel for the husband stated on the record on April 26, 2012, that the daughter would 'ultimately' receive the Sand Mountain properties, but that statement did not specify any other terms, including the proposed manner and timing for the conveyance. Instead, the husband's counsel stated that counsel for both parties 'will work on the language to make [the transfer] happen.' The subsequent correspondence between counsel established that the parties were in conflict at all times over the terms for conveyance in the proposed order. Although the fact-finder must resolve any issue of disputed fact, the undisputed evidence before the trial court showed that no meeting of the minds occurred regarding the Sand Mountain properties at the April 26, 2012, hearing."); *Knox v. Moore,* 475 So. 2d 1199 (Ala. Civ. App. 1985) (affirming trial court's holding that no contract existed where, although "there was unquestionably an agreement for Knox to build Moore a home, and the evidence is clear that Knox substantially performed that task," there was no meeting of the minds as to the compensation to be paid to the builder, a material term of the contract).

meeting of the minds, there was no oral agreement to enforce."). The Court concludes on the fully-developed, undisputed record that mutual assent to terms essential to the formation of a contract is lacking, so that the parties did not enter a valid, express contract.

Because the parties did not enter into a valid, binding contract, the Bartletts' breach of contract claim fails as a matter of law. *American Viking Contractors, Inc. v. Scribner Equipment Co., Inc.*, 745 F.2d 1365, 1370 (11th Cir. 1984) (applying Georgia law and holding that, "Nelson's inability to show a meeting of the minds as to even a single term essential to a restructuring plan convinces us that the district court was justified in finding that there were no genuine issues as to any material fact regarding this matter. Consequently, the order granting Scribner's motion for summary judgment was not improper in this respect."). Therefore, the Court denies the Bartletts' motion for summary judgment on their breach of contract claim and issues summary judgment for the defendants on that claim pursuant to Rule 56(f). Because the Bartletts cannot recover on their breach of contract action, the Court turns to the Bartletts' equitable theories of recovery.

## 2.  Money Had and Received

"An action for money had and received . . . [lies] where one has received money under such circumstances that in equity and good conscience he ought not to retain because in justness and fairness it belongs to another.'" *Jewett v. Boihem*, 23 So. 3d 658, 661 (Ala. 2009) (quoting Marsh & Gamble, Alabama Law of Damages § 34:2 (5th ed. 2004)).  The cause of action "'aims at the abstract justice of the case, and looks solely to the inquiry, whether the defendant holds money, which . . . belongs to the plaintiff."  *Jewett*, 23 So. 3d at 661 (quoting *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951)).[24]  In their brief in opposition to the Bartletts' motion for partial summary judgment, DAAK and the Prestons state that, "the Prestons' conduct in the utilization of Bartlett's money for the payment of personal debts or expenses is not legally justifiable . . ."  (Doc. 102, p. 19).  The Court agrees and finds that no reasonable factfinder could reach a different conclusion.

Operating on the basis of discussions that never were memorialized in writing, the Bartletts conveyed five checks totaling $400,000 to the Prestons to purchase an

---

[24] "'[A] cause of action for money had and received is *less restricted and fettered by technical rules and formalities than any other form of action*.'"  *Jewett*, 23 So. 3d at 661 (quoting *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951)) (emphasis in *Jewett*).

interest in a propane business that the Bartletts knew as "D&S Propane." The Prestons understood that the Bartletts provided the funds for the propane business in anticipation of sharing in the business's profits; however, the Prestons put some of the funds into their personal banking account and spent those funds or personal expenses. To the extent that the Prestons put some portion of the Bartletts' $400,000 investment into DAAK, they did so without conferring a reciprocal benefit on the Bartletts because the Prestons never issued shares of DAAK to the Bartletts. All of this is undisputed. Moreover, it is undisputed that the Prestons took corporate money for personal use. The Bartletts paid for something they never received. As a matter of Alabama law, they are entitled to an equitable remedy.[25]

---

[25] The Bartletts' unjust enrichment claim is similar in many respects to their claim for money had and received. "To prevail on a claim of unjust enrichment under Alabama law, a plaintiff must show that: (1) the defendant knowingly accepted and retained a benefit, (2) provided by another, (3) who has a reasonable expectation of compensation." *Metador Holdings, Inc. v. HoPo Realty Invs.*, LLC, 77 So. 3d 139, 145-46 (Ala. 2011). "One is unjustly enriched if his retention of a benefit would be unjust. . . . Retention of a benefit is unjust if (1) the donor of the benefit . . . acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit . . . engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship." *Id.* at 146. "In the absence of mistake or misreliance by the donor or wrongful conduct by the recipient, the recipient may have been enriched, but he is not deemed to have been unjustly enriched." *Id.* Because the Bartletts can have only one recovery for their loss, and the Court already has determined that the Bartletts are entitled to that recovery under their claim for money had and received, the Court will not analyze the unjust enrichment claim. *Ex parte Barnett*, 978 So. 2d 729, 732 (Ala. 2007) ("although 'a party is entitled to full compensation for his injuries,' *Wilbourn v. Ray,* 603 So. 2d 969, 972 (Ala.1992) (quoting *McClendon v. City of Boaz,* 395 So. 2d 21, 26 (Ala.1981)), he 'can gain but one satisfaction.' *Lee L. Saad Constr. Co. v. DPF Architects, P.C.,* 851 So. 2d 507, 521 (Ala. 2002) (quoting *Mobile Ins., Inc. v. Smith,* 441 So. 2d 894, 896 (Ala.1983)).

**CONCLUSION**

For the reasons stated above, pursuant to Rule 56(g), the Court grants the Bartletts' motion for partial summary judgment on their claim for money had and received.  By separate order, the Court will set a hearing to determine an appropriate award of damages.  Pursuant to Rule 56(f), the Court finds that the defendants are entitled to summary judgment on the Bartletts' breach of contract claim.  Pursuant to Rule 58(a) , the Court will enter these judgments by separate order.

**DONE** and **ORDERED** this 12th day of December, 2013.

MADELINE HUGHES HAIKALA
U.S. DISTRICT JUDGE